Plaintiff instituted this suit against defendant seeking to recover judgment for the amount of $809.25, with legal interest from judicial demand until paid. It alleged that Overdyke Corporation, a jobber and distributor of products of the plaintiff corporation in the Shreveport area which after sale to approved customers assigned the accounts to plaintiff corporation; that from February to September, 1942, the Overdyke Corporation sold to defendant a total of $2,074.93 worth of gasoline on open account. Defendant was recognized as a safe risk by plaintiff, and, therefore, after each sale the Overdyke Corporation would assign the account to plaintiff which at regular monthly intervals mailed statements to defendant; and that the defendant promptly paid these accounts to the amount of $1,265.68, leaving the balance due sued for in this suit.
Defendant in answer denied that it had purchased any gasoline from plaintiff or the Overdyke Corporation and that the gasoline purchased by it during the period covering this account was brought from Holly Bros. and that Holly Bros. had been paid the balance claimed due by plaintiff by compensation, Holly Bros. having been indebted unto plaintiff when they became insolvent and closed their place of business. It denied being indebted unto plaintiff in any amount.
The facts of the case are not difficult to find, most of them being admitted. Mr. Z.P. Holly was a commission agent of the Overdyke Corporation, which was a wholesale distributor of the products of plaintiff. He approached Mr. John Sentell, a stockholder in defendant corporation, and solicited defendant's gasoline business. Holly Bros. owned and operated a grocery store and meat market and were buying but little, if any, of their meat from defendant. In the conversation between Sentell and Holly that question arose, and Z.P. Holly promised to see that Holly Bros. purchased their meat from defendant if defendant would buy its gasoline from him. Mr. Sentell took the matter up with the president of defendant corporation and, finding such an arrangement would be satisfactory, called Mr. Holly who went to defendant's place of business and the President and Mr. Holly, in Mr. Sentell's presence, entered into such an agreement. Prior to that time, defendant was purchasing its gasoline from the Sparco Gasoline Company and were not dissatisfied with the gas or service furnished it, the only reason for the change being to secure the meat business of Holly Bros. which it did from that time until Holly Bros. became insolvent.
There is no doubt from the testimony that the president of defendant company thought that Z.P. Holly was interested in Holly Bros. and that he was dealing with Holly Bros. through him. The fact that Z.P. Holly controlled the meat buying for Holly Bros. justified such a belief and they were never told differently by Z.P. Holly. The name of plaintiff or the Overdyke Corporation at no time entered the discussion and it is certain, to our minds, that defendant was not concerned as to where Holly secured the gasoline, provided it was a good grade. This is borne out by the fact that at first the gasoline was delivered by Cities' Service trucks, then Holly quit his position with the Overdyke Corporation and went *Page 547 
with the Crown Oil Company and for two or three months delivered Crown Oil gasoline in Crown Oil trucks without consulting defendant. He then went back with Overdyke and began again to serve defendant with Cities' Service gasoline without discussing the change with defendant.
There were thirty different deliveries of gasoline to defendant. When deliveries were made, the driver of the truck was given a written requisition for the amount delivered on which was plainly written under the heading, "Seller — Holly Bros." There was only one exception to this being done and that one time the seller was shown on the requisition, which was made out by the President of defendant company, to be Cities' Service. Each check that was given in payment for the gasoline was made payable to Holly Bros. and the checks were endorsed by Holly Bros., by one of the Hollys. Sometimes it was, "Holly Bros. by Z.P. Holly", and again Holly Bros. by some other Holly, and sometimes just, "Holly Bros." They were always cashed and defendant given credit on its account by plaintiff. Every order given for gasoline was telephoned in to a Holly to the phone number given by Z.P. Holly, which happened to be the Holly Filling Station, just across the street from Holly Bros. store and market. Defendant always held back enough money due for gasoline received to protect its account for the bill owed by Holly Bros. for meat, and that is the sole reason why the account claimed by plaintiff against defendant shows a balance due. When Holly Bros. began to show financial strain and got behind with their meat bill, defendant ceased paying its gasoline bill in order to protect itself.
If the above facts were all, the case would be simple, but unfortunately they are not. Z.P. Holly was a commission salesman for the Overdyke Corporation, a jobber and distributor for plaintiff. He did not own any interest in Holly Bros. or the Holly Filling Station, which were owned by different ones of his sons. It is true he helped finance Holly Bros., which was owned entirely by one of his sons, and when it became insolvent, he was a heavy creditor of the business. He felt at liberty to endorse checks made to Holly Bros. and did endorse several issued by defendant in payment of its gasoline.
The thirty times gasoline was delivered to defendant in Cities' Service trucks, an employee of defendant, who was authorized to receive and receipt for the gasoline, signed invoices presented by the truck driver which showed the seller to be Overdyke Corporation and authorized Overdyke to transfer the account to plaintiff herein and charge to defendant's account. Each month plaintiff would send a bill or statement to defendant. It is difficult to realize that two large business corporations would have allowed this method of business to continue over such a long period of time without some investigation by one or the other as to why the requisitions showed defendant buying from Holly Bros. and paying Holly Bros., and the delivering company invoicing it out as sold by Overdyke. Holly Bros. never presented a bill, yet always received the checks. Plaintiff always sent out the monthly statements and never received a check from defendant made payable to it. The checks were all made payable to Holly Bros., endorsed by Holly Bros., who in turn gave them to the driver for Overdyke who delivered them to Overdyke, who in turn sent them to plaintiff which credited defendant's account.
It was on the above facts that the lower court sustained a plea of estoppel filed by the defendant and dismissed plaintiff's suit. We are of the opinion the judgment of the lower court is correct. It is clear, to our minds, that defendant never intended to deal with anyone but Holly Bros., never ordered any gasoline from anyone but Holly Bros., and anyone of the Hollys who received the call had the order filled. It paid for the gasoline month after month always to Holly Bros., without any question or protest from plaintiff or Overdyke. After Holly Bros. became financially weak and were unable to pay their meat bills, defendant continued to sell them meat feeling secure by withholding pay for the gasoline it was getting, and when Holly Bros. failed, it offset the accounts one with the other. In this manner the defendant paid for the gasoline it had received the same as it had paid for the gasoline for which it had given checks to Holly Bros. The silence of plaintiff in regard to defendant paying Holly Bros. monthly for many months caused defendant to pursue the course it did, and since it has now paid Holly Bros. for all the gasoline it purchased, plaintiff is estopped from claiming defendant paid the wrong persons.
The judgment of the lower court is affirmed, with costs. *Page 548